No. 2,160.

IN THE MATTER OF ADMITTING TO NATURALIZATION ONE MARTIN CONNER, *upon the relation of* C. P. SPRAGUE

</div>

JURISDICTION OF COUNTY COURTS.—CONSTRUCTION OF THE ACT OF CONGRESS OF APRIL 14, 1802.—The several County Courts of this State have common law jurisdiction within the meaning of the third section of the Act of Congress of April 14, 1802, establishing a uniform rule of naturalization.

IDEM.—NATURALIZATION.—The County Courts have the power to admit foreigners to all the rights of citizenship and to issue papers of naturalization.

UPON *certiorari* to the County Court of Yolo County, issued upon the relation of C. P. Sprague.

The case is stated in the opinion,

*C. P. Sprague,* in *pro. per.* for Relator:

Cited *Ex parte Knowles* (5 Cal. 303.)

*Jo Hamilton,* Attorney General, Contra:

Cited *Ex parte Burkhardt* (16 Texas 471); *Mungen* v. *Dudley* (16 B. Monroe 722.)

CROCKETT, J., delivered the opinion of the Court:

The only question for decision in this case is whether or not, under the naturalization laws of the United States and the laws and Constitution of this State, the County Courts of this State have power to issue papers of naturalization. The third section of the Act of Congress of April 14, 1802, confers power upon "every Court of Record in any individual State having *common law jurisdiction,* and a seal and clerk or prothonotary." No one will deny that our County Courts are Courts of record, having seals and clerks. The only remaining question, therefore, is whether they have "common law jurisdiction" in the sense in which that term is employed in the Act of Congress.

The power to issue naturalization papers is expressly conferred upon the County Courts by Section 8, Article VI, of the Constitution, as amended in 1862 ; and the next succeeding section confers upon them "original jurisdiction of actions of forcible entry and detainer, of proceedings in insolvency, of actions to prevent or abate a nuisance, and of all such special cases and proceedings as are not otherwise provided for ; and also such criminal jurisdiction as the Legislature may prescribe ; they shall also have appellate jurisdiction in all cases arising in Courts held by Justices of the Peace and Recorders."

Section 366 of the Practice Act provides that on an appeal to the County Court, unless the appeal be on questions of

law alone, "the action shall be tried anew in the County Court, and either party may, on such trial, demand a jury."

Aside from the express power conferred by the Constitution on the County Courts to issue papers of naturalization, it is not difficult to demonstrate that they have "common law jurisdiction," within the true intent of the Act of Congress. The term "common law jurisdiction" is capable of no other meaning than jurisdiction to try and decide causes which were cognizable by the Courts of law, under what is known as the common law of England. Our judicial system having been modelled chiefly after that of England, we have adopted the nomenclature which prevailed in her Courts. Hence, when we speak through our statutes and Courts of common law actions, proceedings at common law and common law jurisdiction, we mean such actions, proceedings and jurisdiction as appertained to the common law of England, as administered through her Courts. Amongst these were actions to prevent or abate a nuisance. All the authorities agree that to maintain a nuisance was an offense at common law, which might be abated by proceedings in the Courts which administered that system of jurisprudence in England. (7 Bacon's Abt. 223. Title Nuisances.)

In this State, Justices of the Peace have jurisdiction of actions arising on contract, actions for damages for injury to the person, or for the taking or detention of personal property, actions for the foreclosure of mortgages on personal property, actions to recover personal property, and other similar actions, when the amount in controversy is less than three hundred dollars. Their jurisdiction extends to almost every class of common law actions, when the amount in contest does not exceed that sum. In all these, appeals may be taken to the County Court, on questions of law or fact, or on both, and in the two latter cases the trial is to be *de novo*, and before a jury, if either party demands it. In all this large class of cases the County Court exercises "common law jurisdiction," as effectually for the purposes of the trial, as if the action had been originally brought in that Court. It has not "common law jurisdiction" in all cases; that is to say, it has not jurisdiction over all classes

of common law actions or proceedings; nor have the District Courts. The jurisdiction, on the contrary, has been apportioned between the District and County Courts. But the Act of Congress does not require that the Courts shall have *all* the common law jurisdiction, which pertains to *all* classes of actions. It is enough that it has "common law jurisdiction." The intention of Congress was to promote the convenience of aliens desiring to be naturalized, by enabling them to obtain their papers from the Courts in their immediate vicinity. The Act was passed prior to the acquisition of Louisiana, and at a time when every State in the Union had adopted a system of jurisprudence founded on the common law of England. When it speaks of Courts having "common law jurisdiction," it refers to such Courts as had been or might be established in the several States to administer justice under that system of jurisprudence, as contradistinguished from merely local, municipal or Police Courts, intended for purely local government. To prevent abuses, and in order to preserve an enduring memorial of its action in granting papers of naturalization, it requires that it shall be a Court of record, having a seal and a clerk or prothonotary. We think our County Courts, as at present organized, fulfil all the requirements of the Act, and are therefore authorized to grant such papers. In *ex parte Knowles* (5 Cal. 303) the Court intimates the opinion that none but the District Courts in this State have the power to issue such papers. But the only question before the Court in that case related to the power of the Supreme Court to issue such papers; and what is there said as to the power of other Courts in that behalf is at most but *obitur dictum*.

But in that case it is decided that the "uniform rule" to which the Constitution refers, and which Congress is authorized to establish, is a uniform rule, to be adopted and carried into effect by the several States, and that when a State designates by law one of its Courts of common law jurisdiction, having a clerk and seal, as authorized to grant papers of naturalization, it has thereby assented to the plan proposed by Congress; and the Court or Courts thus designated have the requisite authority. The Court found that

this State had thus assented to the proposed plan by an Act quoted in the opinion of the Court. That Act yet remains in force; and conceding to that decision its full weight on the general questions discussed, we are nevertheless of opinion that our County Courts, as now organized, have the requisite authority. The counsel intimates a doubt whether that clause of the constitutional amendment of 1862, which expressly confers upon the County Courts the power to issue papers of naturalization was ever properly incorporated into the instrument. But, in our view of the case, it is useless to enter upon that inquiry, inasmuch as without that clause we hold that the County Courts have the requisite authority.

Judgment of the County Court affirmed.

RHODES, C. J., expressed no opinion.